# NOTE

OCTOBER 14, 2017               ADDISON               TEXAS
     **[Date]**              **[City]**            **[State]**

        2517 S 18th St, PHILADELPHIA, PENNSYLVANIA 19145
               **[Property Address]**

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 263,786.00
(this amount is called "Principal"), plus interest to the order of the Lender. The Lender is
HOMEWARD RESIDENTIAL, INC., A DELAWARE CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this
Note by transfer and who is entitled to receive payments under this Note is called the "Note
Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid.
I will pay interest at a yearly rate of          3.875%.

The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 6(B) of this Note

## 3.  PAYMENTS

### (A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the      1st     day of each month beginning on
DECEMBER 1, 2017                I will make these payments every month until I have paid all
of the principal and interest and any other charges described below that I may owe under this
Note  Each monthly payment will be applied as of its scheduled due date and will be applied to
interest and other items in the order described in the Security Instrument before Principal. If, on
NOVEMBER 1, 2047                    , I still owe amounts under this Note, I will pay those
amounts in full on that date, which is called the "Maturity Date."

---

PENNSYLVANIA FHA FIXED RATE NOTE

I will make my monthly payments at   PO BOX 660264, DALLAS, TEXAS 75266-0264

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 1,240.42

## 4.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to any accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6.  BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 4.000 % of the overdue payment of Principal and Interest (P&I). I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10.   UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 11.   EFFECT OF SURVIVAL EVENTS

For purposes of this Note, "Survival Event" is defined as follows:

(a) any default described in Section 6(B) of this Note;
(b) Noteholder requiring me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount under Section 6(C) of this Note;
(c) Noteholder requiring immediate payment in full of all sums secured by the Security Instrument;
(d) the Maturity Date as defined in this Note;

(e)  the entry of any judgment against me under this Note; and

(f)  the entry of any judgment under the Security Instrument.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)                    _____ (Seal)
Paul F Davis                    -Borrower                                                -Borrower


_____ (Seal)                    _____ (Seal)
                                -Borrower                                                -Borrower


_____ (Seal)                    _____ (Seal)
                                -Borrower                                                -Borrower



Loan Originator: John Knox, NMLSR ID █████
Loan Originator Organization: Homeward Residential Inc, NMLSR ID █████
PAY TO THE ORDER OF:    **Ocwen Loan Servicing, LLC**
  WITHOUT RECOURSE
                                                                    *[Sign Original Only]*
HOMEWARD RESIDENTIAL, INC., A DELAWARE CORPORATION
BY: _____
ITS:                                            **Kim Kusnarowis**
                                                **Director/Authorized Signer**

PENSYLVANIA FHA FIXED RATE NOTE
█████                            Page 5 of 5                            █████

# ALLONGE

LOAN NUMBER: █████████

BORROWER (S): Paul F Davis

PROPERTY ADDRESS: 2517 S 18th St
PHILADELPHIA, PA 19145

NOTE/LOAN AMOUNT: $263,786.00

NOTE/LOAN DATE: 10/14/2017

PAY TO THE ORDER OF:

WITHOUT RECOURSE
OCWEN LOAN SERVICING, LLC

_____
Kevin Nowak
Collateral Analyst, Authorized Signer

This Instrument Prepared By:
Carolyn Fatzinger Homeward Residential Inc
2200 West Park Drive Suite 200 Westborough, MA 01581

After Recording Return To:
INDECOMM GLOBAL SERVICES MAIL STOP-FD-HR-9000
1260 ENERGY LANE
ST. PAUL, MINNESOTA 55108

Uniform Parcel Identifier Number:
█████████

Property Address:
2517 S 18th St
PHILADELPHIA, PENNSYLVANIA 19145

——————————— [Space Above This Line For Recording Data] ———————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19 and 20. Certain rules regarding the usage of words used in this document are also provided in Section 15.

**(A)** **"Security Instrument"** means this document, which is dated    OCTOBER 14, 2017   , together with all Riders to this document.
**(B)** **"Borrower"** is    Paul F Davis and Dolores A Naulty-Davis , husband and wife

Borrower is the mortgagor under this Security Instrument.
**(C)** **"MERS"** is   Mortgage Electronic Registration Systems, Inc.   MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing

———————————————————————————————————————————
PENNSYLVANIA FHA MORTGAGE - MERS                    Page 1 of 18

under the laws of Delaware, and has a mailing address of P.O. Box 2026, Flint, MI 48501-2026 and a street address of 1901 E. Voorhees Street, Suite C, Danville, IL 61834. MERS telephone number ▮▮▮▮▮▮

**(D)** **"Lender"** is HOMEWARD RESIDENTIAL, INC.

Lender is a   DELAWARE CORPORATION                                               organized and existing under the laws of   DELAWARE
Lender's address is   16675 ADDISON ROAD, ADDISON, TEXAS 75001. tel.(800)746-2936

**(E)** **"Note"** means the promissory note signed by Borrower and dated   OCTOBER 14 2017 . The Note states that Borrower owes Lender   TWO HUNDRED SIXTY-THREE THOUSAND SEVEN HUNDRED EIGHTY-SIX AND 00/100                              Dollars (U.S. $ 263,786.00              ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   NOVEMBER 1, 2047
**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)** **"Loan"** means the debt evidenced by the Note, plus interest, late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider        ☐ Planned Unit Development Rider
☐ Condominium Rider            ☐ Other(s) [specify]

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L)** **"Escrow Items"** means those items that are described in Section 3.
**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages

PENNSYLVANIA FHA MORTGAGE - MERS
PAMTGZ2 FHA  02/29/16                          Page 2 of 18                          DocMagic eForms
                                                                                     www.docmagic.com

described in Section 5) for  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property, (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)**  **"Mortgage Insurance"** means insurance protecting Lender against the  nonpayment of, or default on, the Loan.

**(O)**  **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)**  **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)**  **"Secretary"** means the Secretary of the United States Department of Housing and Urban Development or his designee.

**(R)**  **"Successor in Interest of Borrower"** means any party  that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender. (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

|                           COUNTY | of |                           Philadelphia |
|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

SEE EXHIBIT "A" ATTACHED HERETO AND BY THIS REFERENCE MADE A PART HEREOF.
A.P.N.: ▓▓▓▓▓▓

which currently has the address of                           2517 S 18th St
                                                             [Street]

              PHILADELPHIA         , Pennsylvania      19145        ("Property Address"):
              [City]                                   [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender. (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from

making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

　　**2.　Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:

　　First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;

　　Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

　　Third, to interest due under the Note;

　　Fourth, to amortization of the principal of the Note; and, Fifth, to late charges due under the Note.

　　Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount of the Periodic Payments.

　　**3.　Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

　　Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the

---

PENNSYLVANIA FHA MORTGAGE - MERS

basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise
in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency,
instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so
insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow
Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding
and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items,
unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make
such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be
paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the
Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the
Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as
required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account
to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held
in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and
Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with
RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in
escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and
Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with
RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly
refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and
impositions attributable to the Property which can attain priority over this Security Instrument,
leasehold payments or ground rents on the Property, if any, and Community Association Dues,
Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall
pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument
unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a
manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b)
contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings
which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings
are pending, but only until such proceedings are concluded; or (c) secures from the holder of the
lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If
Lender determines that any part of the Property is subject to a lien which can attain priority over
this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days
of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of
the actions set forth above in this Section 4.

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter
erected on the Property insured against loss by fire, hazards included within the term "extended
coverage," and any other hazards including, but not limited to, earthquakes and floods, for which
Lender requires insurance. This insurance shall be maintained in the amounts (including deductible

levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be

lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. . Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that this requirement shall cause undue hardship for the Borrower or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

If condemnation proceeds are paid in connection with the taking of the property, Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts, and then to payment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments or change the amount of such payments.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate

information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest

of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co- signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument, or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower If a refund reduces principal, the reduction will be treated as a partial prepayment with no changes in the due date or in the monthly payment amount unless the Note holder agrees in writing to those changes. Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated

notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class·mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.

All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to reinstatement of a mortgage. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees

incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. However, Lender is not required to reinstate if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceedings; (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

**20. Borrower Not Third-Party Beneficiary to Contract of Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower acknowledges and agrees that the Borrower is not a third party beneficiary to the contract of insurance between the Secretary and Lender, nor is Borrower entitled to enforce any agreement between Lender and the Secretary, unless explicitly authorized to do so by Applicable Law.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or

removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence,

Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law

**24. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 18 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Effect of Survival Events.** Both before and after any Survival Event, as defined below, Borrower shall:

(a) pay Funds for Escrow Items or pay Escrow Items directly as provided in Section 3 of this Security Instrument;

(b) pay the amounts and take the actions required by Section 4 of this Security Instrument;

(c) maintain insurance coverages and take the other actions required by Section 5 of this Security Instrument;

(d) maintain, repair and restore the Property and take the other actions required by Section 7 of this Security Instrument;

(e) if this Security Instrument is on a leasehold, comply with all the provisions of the lease;

(f) treat any amounts disbursed by Lender under Section 9 of this Security Instrument as additional debt of Borrower secured by this Security Instrument;

(g) maintain and pay the premiums for Mortgage Insurance, or make payments to Lender if Mortgage Insurance coverage is not available, and take the other actions required by Section 10 of this Security Instrument;

(h) permit the collection and application of miscellaneous proceeds as required by Section 11 of this Security Instrument;

(i) pay the fees required by Section 14 of this Security Instrument;

(j) continue to abide by the restrictions and take the actions required by Section 21 of this Security Instrument;

(k) pay any collection expenses under Section 22 of this Security Instrument; and

(l) pay interest at the rate payable from time to time under the Note. "Survival Event" means any of the following:

(a) any default described in the Note;

(b) Lender requiring Borrower to pay immediately the full amount of Principal which has not been paid and all the interest that Borrower owes on that amount under the Note;

(c)  Lender requiring immediate payment in full of all sums secured by this Security Instrument as described in the Note and Sections 18 and 22 of this Security Instrument;
(d)  the Maturity Date as defined in the Note;
(e)  the entry of any judgment against Borrower under the Note; and
(f)  the entry of any judgment under this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
Paul F Davis                      -Borrower

_____ (Seal)
Dolores A Naulty-Davis        -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

PENNSYLVANIA FHA MORTGAGE - MERS

——————————————— [Space Below This Line For Acknowledgment] ———————————————

State of ___PENNSYLVANIA_____

County of ___Philadelphia_____

On this the _14_ day of ___OCT   2017___, before me, _____

_____ *Keith  A Bush_____,

the undersigned officer, personally appeared ___Paul F Davis AND Dolores A

Naulty-Davis • _____

_____

known to me (or satisfactorily proven) to be the person whose name ____ARE_____

_____

subscribed to the within instrument and acknowledged that ___THey_____

_____

executed the same for the purposes therein contained.

   In witness whereof I hereunto set my hand and official seal.

```
        Commonwealth of Pennsylvania
             Notarial Seal
        KEITH A BUSH – Notary Public
    LANSDOWNE BORO, DELAWARE COUNTY
     My Commission Expires Jun 24, 2021
```

_____NOTARY PUBLIC____

Title of Officer

      (Seal)

Loan Originator: John Knox, NMLSR ID█████████
Loan Originator Organization: Homeward Residential Inc, NMLSR ID████████
PENNSYLVANIA FHA MORTGAGE - MERS                    Page 17 of 18

## Certificate of Residence of Mortgagee

The undersigned hereby certifies that:  (i) he/she is the Mortgagee or the duly authorized attorney or agent of the Mortgagee named in the within instrument; and (ii) Mortgagee's precise residence is:  1901 E. Voorhees Street, Suite C, Danville, IL 61834

Witness my hand this __14__ day of __10 2017__

_Lakeesha Weston_
Signature of Mortgagee or
Mortgagee's Duly Authorized Attorney or Agent

_Lakeesha Weston_
Type or Print Name of Mortgagee or
Mortgagee's Duly Authorized Attorney or Agent

EXHIBIT A - LEGAL DESCRIPTION

Tax Id Number(s) ▮▮▮▮▮▮▮

Land situated in the City of Philadelphia in the County of Philadelphia in the State of PA

SITUATE AND DESCRIBED AS FOLLOWS, IN THE 26TH WARD OF THE CITY OF PHILADELPHIA COUNTY
AND STATE OF PENNSYLVANIA.

SITUATE ON THE EASTERLY SIDE OF EIGHTEENTH STREET FIFTEEN FEET WIDE AT THE DISTANCE OF
TWO HUNDRED FEET ONE INCH NORTHWARDLY FROM THE NORTHERLY SIDE OF SHUNK STREET SIXTY
FEET WIDE, IN THE TWENTY-SIXTH WARD OF THE CITY OF PHILADELPHIA.

CONTAINING IN FRONT OR BREADTH ON THE SAID EASTERLY SIDE OF EIGHTEENTH STREET TWENTY
TWO FEET THREE INCHES AND EXTENDING IN LENGTH OR DEPTH EASTWARDLY OF THAT WIDTH
BETWEEN PARALLEL LINES AT RIGHT ANGLES TO SAID EIGHTEENTH STREET EIGHTY-EIGHT FEET FOUR
INCHES.

NOTE: The Company is prohibited from insuring the area or quantity of the land. The Company does
not represent that any acreage or footage calculations are correct. References to quantity are for
identification purposes only.

Commonly known as:   2517 South 18th Street, Philadelphia, PA 19145

THE PROPERTY ADDRESS AND TAX PARCEL IDENTIFICATION NUMBER LISTED ARE PROVIDED SOLELY FOR
INFORMATIONAL PURPOSES

**Prepared By: Felicia Perry**
PHH Mortgage Services
Attn:  Modification Processing
PO Box 24737
West Palm Beach. FL 33416-9838
▮▮▮▮▮▮

_____[Space Above This Line for Recording Data]_____

# LOAN MODIFICATION AGREEMENT

| | |
|---|---|
| Servicer: | PHH Mortgage Services |
| Original Mortgagor / Maker: | PAUL F DAVIS AND DOLORES A NAULTY-DAVIS |
| Marital Status: | MARRIED |
| Original Mortgagee / Payee: | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR HOMEWARD RESIDENTIAL, INC., ITS SUCCESSORS AND ASSIGNS |

| | | |
|---|---|---|
| Original Amount: | $ | 263, 786.00 |
| Original Mortgage Date: | | OCTOBER 14, 2017 |
| Date Recorded: | | OCTOBER 23, 2017 |
| CRFN / Document/Instrument #: | | |
| AP# / Parcel #: | | ▮▮▮▮▮ |
| Property Address: | | 2517 S 18TH ST |
| City: PHILADELPHIA | | County: PHILADELPHIA    State: PENNSYLVANIA |

| | |
|---|---|
| Present Holder of the Note and Lien: | PHH MORTGAGE CORPORATION |
| Holder's Mailing Address: | PO Box 24737 |
| (Including county) | West Palm Beach, FL 33416-9838 |
| | Palm Beach County |
| Pre MOD UPB | $223,331.06 |
| New Loan Amount | $231,918.01 |
| New Money | $8,586.95 |

LEGAL DESCRIPTION: SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

Registered Land (OH Only):    ☐ YES       ☐ NO
AFN# (OH Only):         _____

District (NYC Only): _____   Section: _____   Block: _____   Lot: _____

District (MA Only): _____

Lot (DC Only): _____       Square: _____

## **Certificate of Preparation**

This is to certify that this instrument was prepared by PHH Mortgage
Corporation, one of the parties named in the instrument.


_Felicia Perry_
**Felicia Perry**    Authorized Signer

LOSS MITIGATION

PHH Mortgage Corporation
Loss Mitigation Department
5720 Premier Park Dr
West Palm Beach, FL 33407

Investor/Owner: PHH Mortgage Corporation
This document was prepared by PHH Mortgage Corporation

**After Recording Return To:**
PHH Mortgage Corporation
Attention: Modification Processing
PO Box 24737
West Palm Beach, FL 33416-9838

_____ [Space Above This Line For Recording Data]_____

## MODIFICATION AGREEMENT

The debtor(s), PAUL F DAVIS
Non-Obligor (contributor):  DOLORES A NAULTY-DAVIS
PHH Mortgage Corporation through the servicer of the underlying mortgage loan agreement, PHH Mortgage Corporation, have agreed to modify the terms of said underlying mortgage loan agreement. PHH Mortgage Corporation is the owner of the loan and retains all rights to collect payments as per the underlying mortgage loan agreement.  PHH Mortgage Corporation, remains servicer for said underlying mortgage loan agreement.
Borrower ("I"):  PAUL F DAVIS
Non-Obligor (contributor):  DOLORES A NAULTY-DAVIS

Lender/Servicer or Agent for Lender/Servicer ("Lender"):  PHH Mortgage Corporation

Investor/Owner: PHH Mortgage Corporation
Date of first lien Security Instrument ("Mortgage") and Note ("Note"):  10/14/2017
Loan Number:

Property Address ("Property"):
                                    2517 S 18TH ST
                                    PHILADELPHIA, PA 19145

If my representations in Section 1 continue to be true in all material respects, then this Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note

Page 1

secured by the Mortgage. The Note is secured by a Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated the same date as the Note, in the real property records of Philadelphia County, PA. Said Security Instrument covers the real and personal property described in such Security Instrument (the "Property") located at 2517 S 18TH ST, PHILADELPHIA, PA 19145, which real property is more particularly described as follows.

**(Legal Description – Attached as Exhibit if Recording Agreement)**

The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents". Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents

This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1.  **My Representations**. I certify, represent to Lender and agree:

    A.  I am experiencing a financial hardship due to a disaster in my area.

    B.  I live in the Property as my principal residence, and the Property has not been condemned.

    C.  There has been no change in the ownership of the Property since I signed the Loan Documents.

    D.  I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for a modification of the Loan Documents)

    E.  Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct and

    F.  If Lender requires me to obtain credit counseling in connection with the Program, I will do so and

    G.  If I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

2.  **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

    A.  Time is of the essence under this Agreement.

    B.  If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents and

    C.  I understand that the Loan Documents will not be modified unless and until (i) I receive from the Lender a copy of this Agreement signed by the Lender, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3.  **The Modification**. If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on 05/01/2023 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. The Loan Documents will be modified and the first modified payment will be due on 06/01/2023.

A. The new Maturity Date will be: 05/01/2053.

B. As of 05/01/2023, the amount payable under the Note and the Security Instrument (the 'New Principal Balance') is U.S. $231,918.01. This includes the prior outstanding unpaid principal balance (including, but not limited to, any previously capitalized amounts under any prior loan modifications) and is increased by this modification only to include past due payments which include principal, interest and any applicable escrow amounts missed during the recent disaster forbearance plan. Any amounts not added to the New Principal Balance will remain on the account until paid and will become due when the interest-bearing balance is paid in full or upon maturity as applicable pursuant to State or Federal law. **All other terms outside of this Modification Agreement remain unchanged by this Agreement. This Agreement supplements any applicable, prior Modification Agreement and does not replace any modified loan terms that are not changed as outlined below. Customer understands that the terms listed below are the current loan terms which remain once this Modification Agreement is effective.**

Interest at the rate of 6.25% will begin to accrue on the Interest Bearing Principal Balance as of 05/01/2023 and the first new monthly payment on the Interest Bearing Principal will be due on 06/01/2023.

Borrower's payment schedule for the modified Loan is as follows:

| Years | Interest Rate (%) | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1 - 30 | 6.25 | 05/01/2023 | $1,427.96 | $643.00 | $2,070.96 | 06/01/2023 | 360 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly. The escrow payment amounts shown are based on current data and represent a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

The above terms in this Section 3. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

C. I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

D. If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.

4. **Additional Agreements**. I agree to the following:

A. That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement.

Page 3

B. That this Agreement shall supersede the terms of any modification, forbearance, or Workout Plan that I previously entered into with Lender.

C. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D. Funds for Escrow Items. I will pay to the Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments the Lender requires to be escrowed. These items are called "Escrow Items". I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its right under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

E.  That this Agreement constitutes notice that the Servicer's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my Escrow Account.

F.  That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

G.  That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

H.  That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if state or federal law, rules or regulations prohibits the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

I.  That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. Except as noted herein, this Agreement may not, under any circumstances, be assigned to, or assumed by, a buyer or transferee of the Property.

J.  That, as of the Modification Effective Date, any provision in the Note, as amended for the assessment of a penalty for full or partial prepayment of the Note is null and void.

K.  That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in the first lien position and/or is fully enforceable upon modification and that if, under any circumstances and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s), and/or subordination agreement(s), then the terms of this Agreement will not become effective on Modification Effective Date and the Agreement will be null and void.

L.  That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification .

M.  Mortgage Electronic Registration Systems, Inc. (MERS) is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, ▮▮▮▮▮▮▮▮ In the cases where the loan has been registered with MERS who has only legal title to the interests granted by the Borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests,

including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage Loan.

N. In the event of a future default only, Borrower authorizes Lender, and Lender's successors and assigns, to share its contact information with Third Parties that can assist Lender and Borrower in obtaining a foreclosure prevention alternative. For purposes of this section, Third Parties are limited to HUD-certified housing counseling agencies or state or local government housing finance agencies.

O. That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this section 4.N. shall be referred to as "Documents". I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement. This Agreement may not be supplemented, changed, modified or omitted except by written document executed by both me and PHH Mortgage Services. This Modification constitutes the entire agreement between me and PHH Mortgage Services and, supersedes all previous negotiations and discussions between me, PHH Mortgage Services and/or PHH Mortgage Services predecessors in interest, and neither prior evidence nor any prior or other agreement shall be permitted to contradict or vary its terms. There are no promises, terms, conditions, or obligations other than those contained in this Agreement.

P. That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

## BORROWER ACKNOWLEDGEMENT – MODIFICATION AGREEMENT

**IMPORTANT – Do NOT sign this Agreement unless you are in the presence of a notary. If extenuating circumstances prevent one notary signature, separately signed and notarized agreements will be accepted; however, the agreements must be returned in the same package to PHH Mortgage Corporation.**

Each of the Borrower(s) and the Lender acknowledge that no representations, agreements or promises were made by the other party or any of its representatives other than those representations, agreements or promises specifically contained herein.  This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

All individuals on the mortgage, note and the property title must sign this Agreement.

All signatures must exactly match the names that are printed in the Agreement, as well as the names on the recorded deed for the property.

5/12/2023
Date

PAUL F DAVIS

5/12/2023
Date

DOLORES A NAULTY-DAVIS

State of _Pennsylvania_

County of _Philadelph_

On this _12_ day of _05_ _2023_, before me, the undersigned, a Notary Public in and for said county and state, personally appeared _Paul F Davis    Dolores A Naughty-Davis_ personally known to me or identified to my satisfaction to be the person(s) who executed the within instrument, and they duly acknowledged that said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____
Notary Public

My Commission Expires: _03/30/2027_

Commonwealth of Pennsylvania - Notary Seal
Ratanak Penh, Notary Public
Philadelphia County
My commission expires March 30, 2027
Commission numbe ▮▮▮▮▮
Member, Pennsylvania Association of Notaries

## LENDER ACKNOWLEDGEMENT

### (For Lender's Signature Only)

Lender acknowledges that no representations, agreements or promises were made or any of its representations other than those representations, agreements or promises specifically contained herein. This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

PHH Mortgage Corporation

*Felicia Perry*

Authorized Signer

Felicia Perry    MAY 2 2 2023

Date

State of _____ **Florida** _____

County of _____ **Palm Beach** _____

On this __ day of _____, ____, before me, the undersigned, a Notary Public in and for said county and state, personally appeared _____ **Felicia Perry** _____, personally known to me or identified to my satisfaction to be the person who executed the within instrument as _____ **Authorized Signer** _____ of PHH Mortgage Corporation., said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

*Nadia S Cordero*

Notary Public State of Florida
NADIA S CORDERO
My Commission ▮▮▮▮▮
Expires 05/17/2024

Notary Public

My Commission Expires: _____ MAY 1 7 2024 _____

## EXHIBIT "A"

ALL THAT CERTAIN LOT OR PIECE OF GROUND WITH THE BUILDINGS AND
IMPROVEMENTS THEREON ERECTED.

SITUATE AND DESCRIBED AS FOLLOWS, IN THE 26TH WARD OF THE CITY OF
PHILADELPHIA COUNTY AND STATE OF PENNSYLVANIA.

SITUATE ON THE EASTERLY SIDE OF EIGHTEENTH STREET FIFTEEN FEET WIDE AT
THE DISTANCE OF TWO HUNDRED FEET ONE INCH NORTHWARDLY FROM THE
NORTHERLY SIDE OF SHUNK STREET SIXTY FEET WIDE, IN THE TWENTY-SIXTH WARD
OF THE CITY OF PHILADELPHIA.

CONTAINING IN FRONT OR BREADTH ON THE SAID EASTERLY SIDE OF EIGHTEENTH
STREET TWENTY TWO FEET

THREE INCHES AND EXTENDING IN LENGTH OR DEPTH EASTWARDLY OF THAT WIDTH
BETWEEN PARALLEL LINES AT RIGHT ANGLES TO SAID EIGHTEENTH STREET EIGHTY-
EIGHT FEET FOUR INCHES.

PHH MORTGAGE CORPORATION

*Felicia Perry*

By:  Felicia Perry
Authorized Signer
Date:  22-May-2023

WITNESSES:

_Elsie R._

Elsie Ramirez

Hubert Paul

STATE OF Florida }
COUNTY OF Palm Beach }

     On 22-May-2023, before me, the undersigned Notary Public, personally appeared Felicia Perry, Authorized Signer, of PHH Mortgage Corporation, personally known to me to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, that by her signature on the instrument, the individual(s) or person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the county of Palm Beach, State of Florida.

Witness my hand and official seal.

Notary Public State of Florida
NADIA S CORDERO
My Commission ▓▓▓▓▓
Expires 05/17/▓▓▓▓

*Nadia S Cordero*

Notary — State of Florida
County of Palm Beach
**Nadia S Cordero**

**Prepared by:**  Felicia Perry

# Certificate of Residence

### LOAN MODIFICATION AGREEMENT

_____
Title of Document:

Between:

### DAVIS

_____
Assignor/Mortgagor/Grantor

### PHH

_____
Assignee/Mortgagee/Grantee


The precise address of the within named ASSIGNEE/MORTGAGEE/GRANTEE is:

PHH MORTGAGE SERVICIES, INC
5720 Premier Park Dr.
West Palm Beach, FL 33407

By:__Felicia Perry _____

Case 25-11312-djb   Doc 41-5   eRecorded in Philadelphia P2/26/25 13:45:29   Desc
Loan document 01 Page 40   Page 1 of 3   Rec Fee: $224.75
Receipt#: 18-117317
Records Department   Doc Code: A

When Recorded Return To:
OCWEN LOAN SERVICING, LLC
1795 INTERNATIONAL WAY
IDAHO FALLS, ID  83402

### CORPORATE ASSIGNMENT OF MORTGAGE

**Philadelphia, Pennsylvania**
**SELLER'S SERVICING** ▮▮▮▮▮▮ ; "DAVIS"
**SELLER'S LENDER ID#:** ▮▮▮▮
**INVESTOR'S LOAN #:** ▮▮
**OLD SERVICING #:** ▮▮▮▮▮▮

Date of Assignment: November 16th, 2018

Assignor: Mortgage Electronic Registration Systems, Inc. as nominee for Homeward Residential, Inc., its successors and assigns
Assignee: OCWEN LOAN SERVICING, LLC

I hereby certify the precise address of the within named Assignor is PO BOX 2026 FLINT MI 48501, 1901 E VOORHEES ST, STE C, DANVILLE, IL  61834.

I hereby certify the precise address of the within named Assignee is 1661 WORTHINGTON ROAD, SUITE 100, WEST PALM BEACH, FL  33409.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC has a physical address at 1901 E Voorhees Street, Suite C, Danville, IL 61834 and a mailing address at P.O. BOX 2026, FLINT, MI 48501-2026

Executed By: PAUL F DAVIS AND DOLORES A NAULTY-DAVIS, HUSBAND AND WIFE  To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR HOMEWARD RESIDENTIAL, INC., ITS SUCCESSORS AND ASSIGNS
Date of Mortgage: 10/14/2017 Recorded:  10/23/2017  as Instrument/Document: 53282084  In the County of Philadelphia, State of Pennsylvania.
Property Address: 2517 S 18TH ST, PHILADELPHIA, PA  19145 in the City of Philadelphia
Legal:  See Exhibit "A" Attached Hereto And By This Reference Made A Part Hereof

I do certify that the precise address of OCWEN LOAN SERVICING, LLC is 1661 WORTHINGTON ROAD, SUITE 100, WEST PALM BEACH, FL  33409

Attested By: _____   **Alma Gomez**

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

    KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage having an original principal sum of $263,786.00 with interest, secured thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's interest under the Mortgage.

    TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.
Mortgage Electronic Registration Systems, Inc. as nominee for Homeward Residential, Inc., its successors and assigns

On **November 16,2018**

By: _____
Jimilla B. Hicks
Assistant Secretary

STATE OF FLORIDA
COUNTY OF PALM BEACH

                                 **Kayla Murphy**
On **November 16,2018**, before me, _____, a Notary Public in and for Palm Beach in the State of Florida, personally appeared **Jimilla B. Hicks**, Assistant Secretary of Mortgage Electronic Registration Systems, Inc. as nominee for Homeward Residential, Inc., its successors and assigns, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____
Kayla Murphy

Notary Expires: JUN 2 1 2019

KAYLA MURPHY
Notary Public - State of Florida
Commission ▮▮▮▮▮▮
My Comm. Expires June 21, 2019

(This area for notarial seal)

EXHIBIT "A"

Land situated  in the City of Philadelphia in the County of Philadelphia in the State of PA

SITUATE AND DESCRIBED AS FOLLOWS, IN THE 26TH WARD OF THE CITY OF PHILADELPHIA COUNTY AND STATE OF PENNSYLVANIA.

SITUATE ON THE EASTERLY SIDE OF EIGHTEENTH STREET FIFTEEN FEET WIDE AT THE DISTANCE OF TWO HUNDRED FEET ONE INCH NORTHWARDLY FROM THE NORTHERLY SIDE OF SHUNK STREET SIXTY FEET WIDE, IN THE TWENTY-SIXTH WARD OF THE CITY OF PHILADELPHIA.

CONTAINING IN FRONT OR BREADTH ON THE SAID EASTERLY SIDE OF EIGHTEENTH STREET TWENTY TWO FEET THREE INCHES AND EXTENDING IN LENGTH OR DEPTH EASTWARDLY OF THAT WIDTH BETWEEN PARALLEL LINES AT RIGHT ANGLES TO SAID EIGHTEENTH STREET EIGHTY-EIGHT FEET FOUR INCHES.

NOTE: The Company is prohibited from insuring the area or quantity of the land. The Company does not represent that any acreage or footage calculations are correct. References to quantity are for identification purposes only.

When Recorded Return To:
OCWEN LOAN SERVICING, LLC
1795 INTERNATIONAL WAY
IDAHO FALLS, ID  83402

---

## CORPORATE ASSIGNMENT OF MORTGAGE

**Philadelphia, Pennsylvania**
**SELLER'S SERVICING**  ▮▮▮▮▮▮  **"DAVIS"**
**SELLER'S LENDER ID:** ▮▮▮▮▮▮▮▮▮

Date of Assignment: 05/22/2019

Assignor: OCWEN LOAN SERVICING, LLC
Assignee: PHH MORTGAGE CORPORATION

I hereby certify the precise address of the within named Assignor is 1661 WORTHINGTON ROAD,
SUITE 100, WEST PALM BEACH, FL  33409.

I hereby certify the precise address of the within named Assignee is 1 MORTGAGE WAY, MOUNT
LAUREL, NJ  08054.

Executed By: PAUL F DAVIS AND DOLORES A NAULTY-DAVIS, HUSBAND AND WIFE  To:
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR HOMEWARD
RESIDENTIAL, INC., ITS SUCCESSORS AND ASSIGNS
Date of Mortgage: 10/14/2017 Recorded:  10/23/2017  as Instrument/Document: 53282084  In the
County of Philadelphia, State of Pennsylvania.
Property Address: 2517 S 18TH ST, PHILADELPHIA, PA  19145 in the City of Philadelphia
Legal:  See Exhibit "A" Attached Hereto And By This Reference Made A Part Hereof

I do certify that the precise address of PHH MORTGAGE CORPORATION is 1 MORTGAGE WAY,
MOUNT LAUREL, NJ 08054
Attested By:

_Jamell Strachan_

   KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and
sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named
Assignee, the said Mortgage having an original principal sum of $263,786.00 with interest, secured
thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained,
and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's interest under
the Mortgage.

   TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever,
subject to the terms contained in said Mortgage.

53518485    Page 2 of 3    05/30/2019 09:51 AM

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

OCWEN LOAN SERVICING, LLC
On 05/22/2019

By
Beverly Clayton
Servicing Operations Specialist

STATE OF FLORIDA
COUNTY OF PALM BEACH

On 05/22/2019, before me, _____Jacoby Denard Waters_____, a Notary Public in and for Palm Beach in the
State of Florida, personally appeared Beverly Clayton, Servicing Operations Specialist of OCWEN LOAN
SERVICING, LLC, personally known to me (or proved to me on the basis of satisfactory evidence) to be
the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on
the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument.

WITNESS my hand and official seal,

_____Jacoby Denard Waters_____
Notary Expires:    /    /
          JUN 0 6 2020

JACOBY DENARD WATERS
Notary Public - State of Florida
Commission ▮▮▮▮▮▮
My Comm. Expires Jun 6, 2020

(This area for notarial seal)

## EXHIBIT A

## LEGAL DESCRIPTION

Land situated  In the City of Philadelphia in the County of Philadelphia in the State of PA

SITUATE AND DESCRIBED AS FOLLOWS, IN THE 26TH WARD OF THE CITY OF PHILADELPHIA COUNTY AND STATE OF PENNSYLVANIA.

SITUATE ON THE EASTERLY SIDE OF EIGHTEENTH STREET FIFTEEN FEET WIDE AT THE DISTANCE OF TWO HUNDRED FEET-ONE INCH NORTHWARDLY FROM THE NORTHERLY SIDE OF SHUNK STREET SIXTY FEET WIDE, IN THE TWENTY-SIXTH WARD OF THE CITY OF PHILADELPHIA.

CONTAINING IN FRONT OR BREADTH ON THE SAID EASTERLY SIDE OF EIGHTEENTH STREET TWENTY TWO FEET THREE INCHES AND EXTENDING IN LENGTH OR DEPTH EASTWARDLY OF THAT WIDTH BETWEEN PARALLEL LINES AT RIGHT ANGLES TO SAID EIGHTEENTH STREET EIGHTY-EIGHT FEET FOUR INCHES.

NOTE: The Company is prohibited from insuring the area or quantity of the land. The Company does not represent that any acreage or footage calculations are correct. References to quantity are for identification purposes only.

Commonly known as:   2517 South 18th Street, Philadelphia, PA 19145

THE PROPERTY ADDRESS AND TAX PARCEL IDENTIFICATION NUMBER LISTED ARE PROVIDED SOLELY FOR INFORMATIONAL PURPOSES

MRG

FILED

MAY 31 2019

STATE TREASURER

# CERTIFICATE OF MERGER

## OF

## OCWEN LOAN SERVICING, LLC
### (a Delaware limited liability company)

WITH AND INTO

## PHH MORTGAGE CORPORATION
### (a New Jersey corporation)

Pursuant to Section 14A of the New Jersey Business Corporation Act, the domestic business corporation and the other business entity hereinafter named do hereby submit the following Certificate of Merger.

1.      The names of the parties to the merger herein certified (the "*Merger*") are PHH Mortgage Corporation, a corporation organized and existing under the laws of the State of New Jersey (the "*Company*"), and Ocwen Loan Servicing, LLC, a limited liability company formed and existing under the laws of the State of Delaware (the "*Merging Entity*").

2.      Annexed hereto and made a part hereof is the Agreement and Plan of Merger, dated May 2, 2019, between the Company and the Merging Entity for merging the Merging Entity with and into the Company, with the Company as the surviving corporation, as approved by the Board of Directors and the sole shareholder of the Company and the Board of Managers of the Merging Entity.

3.      The name of the surviving corporation shall be PHH Mortgage Corporation.

4.      The Certificate of Incorporation of the Company, which is the surviving corporation, shall continue in full force and effect as the Certificate of Incorporation of the surviving corporation.

5.      The number of shares of the Company entitled to vote at the time of the approval of the Agreement and Plan of Merger by its sole shareholder was 1,000, all of which were of one class.  On May 1, 2019, the Company's sole shareholder approved the Agreement and Plan of Merger pursuant to a written consent.

6.      On February 11, 2019, the Board of Managers of the Merging Entity approved the Agreement and Plan of Merger pursuant to a written consent.

7.      The applicable provisions of the laws of the jurisdiction of formation of the Merging Entity relating to the merger of the Merging Entity with and into the Company will have been complied with upon compliance with any of the filing and recording requirements thereof.

8.      The Company will continue its existence as the surviving corporation under its present name pursuant to the provisions of the laws of its jurisdiction of organization.

9.      The effective date of the merger herein provided for in the State of New Jersey shall be 12:01 a.m. Eastern Time on June 1, 2019.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned have executed and acknowledged this
Certificate of Merger as of May __30__, 2019.

OCWEN LOAN SERVICING, LLC

By: _____

Name: Arthur C. Walker, Jr.

Title:  Senior Vice President

PHH MORTGAGE CORPORATION

By: _____

Name:  Alberino Celini

Title:   Vice President

[ *Signature Page to Certificate of Merger – Owen Loan Servicing, LLC* ]

Page 5

---

<u>**Annex A**</u>

**Agreement and Plan of Merger**

[See attached.]

*Execution Version*

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (the "*Merger Agreement*") is entered into as of May 2, 2019 by and between Ocwen Loan Servicing, LLC, a Delaware limited liability company ("*OLS*"), and PHH Mortgage Corporation, a New Jersey corporation ("*PMC*"). OLS and PMC are collectively referred to herein as the "*Parties*" and each, individually, as a "*Party*."

### WITNESSETH:

WHEREAS, OLS is a limited liability company duly organized and existing under the laws of the State of Delaware;

WHEREAS, PMC is a corporation duly organized and existing under the laws of the State of New Jersey;

WHEREAS, the Board of Managers of OLS and the Board of Directors of PMC have each determined that it is advisable and in the best interests of said entities and their respective member and stockholder that OLS merge with and into PMC, with PMC as the surviving entity (the "*Merger*"), upon the terms and conditions of this Merger Agreement; and

WHEREAS, the Parties have both adopted the OMS-PMC Plan of Reorganization and intend for this Merger to occur pursuant to the overall Transactions laid out in the OMS-PMC Plan of Reorganization, that, when taken together, are intended to be and will be treated as a tax-free reorganization under section 368(a)(1) of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

NOW, THEREFORE, BE IT RESOLVED, in consideration of the mutual agreements and covenants set forth herein, OLS and PMC hereby agree as follows:

1.    Authorization. The execution and delivery of this Merger Agreement by OLS and the consummation by OLS of the transactions contemplated hereby have been authorized and approved by the Board of Managers of OLS, and the execution and delivery of this Merger Agreement by PMC and the consummation by PMC of the transactions contemplated hereby have been authorized and approved by each of the Board of Directors of PMC and by the sole stockholder of PMC.

2.    The Merger. The effective time (the "*Effective Time*") of the Merger shall be the later of (A) 12:01 a.m. Eastern Time on June 1, 2019, or (B) upon the filing of the applicable Certificate of Merger with the Secretary of State of the State of Delaware and the applicable Certificate of Merger with the New Jersey Division of Revenue. At the Effective Time, OLS shall, pursuant to the New Jersey Business Corporation Act and the Delaware Limited Liability Company Act, be merged with and into PMC and PMC shall be the surviving corporation (and shall sometimes hereinafter be referred to as the "surviving corporation") and shall continue to exist as said surviving corporation under its present name pursuant to the provisions of the New Jersey Business Corporation Act. From and after the Effective Time, all real and personal property, tangible and intangible, of every kind and description, and all the rights, privileges, immunities, powers, purposes, franchises, licenses and authority of OLS shall vest in PMC as the surviving corporation, and all debts, liabilities, obligations, restrictions and duties of OLS shall become the debts, liabilities, obligations, restrictions and duties of PMC as the surviving corporation. Neither the rights of creditors nor any liens upon, or security interests in, the property of either PMC or OLS shall be impaired by the Merger. The separate existence of OLS shall cease at the Effective Time in accordance with the laws of the State of Delaware.

3.    Governing Documents.

(a)    Certificate of Incorporation. The Certificate of Incorporation of PMC as in force and effect at the Effective Time shall be the Certificate of Incorporation of the surviving corporation and shall continue in full force and effect until amended in the manner prescribed therein or by the New Jersey Business Corporation Act.

(b)    Bylaws. The Bylaws of PMC as in force and effect at the Effective Time shall be the Bylaws of the surviving corporation and shall continue in full force and effect until amended in the manner prescribed therein or by the New Jersey Business Corporation Act.

4.    Directors and Officers.   The directors and officers of the surviving corporation in office at the Effective Time shall be the members of the first Board of Directors and the first officers of the surviving corporation, all of whom shall hold their directorships and offices until the election and qualification of their respective successors or until their tenure is otherwise terminated in accordance with the bylaws of the surviving corporation

5.    OLS Membership Interests.   The outstanding and existing limited liability company interests in OLS shall, at the Effective Time, be cancelled and retired and cease to exist, and no consideration shall be delivered in exchange therefor.

6.    PMC Shares.   The issued and outstanding shares of capital stock of PMC shall not be converted or exchanged in any manner, or be entitled to the payment or delivery of any consideration in exchange therefor, but each said share which is issued and outstanding as of the Effective Time shall continue to represent one issued and outstanding share of the surviving corporation.

7.    Miscellaneous.

(a)    Assignment; Binding Effect.   This Merger Agreement and the rights and obligations of the Parties hereunder may not be assigned by either Party without the prior written consent of the other Party hereto. This Merger Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors, heirs, executors, administrators, legal representatives and assigns.

(b)    Amendment; Waiver.   Prior to the Effective Time, any amendment hereto shall be effective only if signed by all Parties hereto. No waiver of any provisions of this Merger Agreement shall be valid unless in writing and signed by the party against whom enforcement is sought.

(c)    Governing Law.   This Merger Agreement, the rights and obligations of the Parties hereto, and any claims or disputes relating thereto, shall be governed by and construed in accordance with the laws of the State of New Jersey, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

(d)    Tax-Treatment.   In accordance with the OMS-PMC Plan of Reorganization, the Parties hereby agree that the Merger is intended to be and will be treated as by both Parties as a tax-free reorganization under section 368(a)(1) of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

(e)    Severability.   In the event that any provision of this Merger Agreement shall be invalid or unenforceable in any respect, such provision shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining provisions of this Agreement.

2

(f)   <u>Further Assurances</u>.  The Board of Managers and proper officers of OLS and the Board of Directors and proper officers of PMC are hereby authorized, empowered, and directed to do any and all acts and things, and to make, execute, deliver, file and/or record any and all instruments, papers, and documents which shall be or become necessary, proper, or convenient to carry out or put into effect any of the provisions of this Merger Agreement or of the Merger herein provided for.

(g)   <u>Counterparts</u>.  This Merger Agreement may be executed by the Parties hereto in counterparts (including by facsimile or PDF), each of which when so executed and delivered will be deemed an original and all of which shall constitute one and the same instrument.  Signatures delivered by facsimile or other electronic transmission (such as e-mail in PDF format) shall have the same force and effect as manual signatures delivered in person.

(h)   <u>Recordkeeping</u>.  PMC shall maintain this Merger Agreement on file at the its principal place of business.  PMC shall furnish a copy of this Merger Agreement, on request and without cost, to any member of OLS in accordance with the Delaware Limited Liability Company Act.

(i)   <u>Termination</u>.  This Merger Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time by action of either party hereto.  If this Merger Agreement is terminated pursuant to this <u>Section 7(i)</u>, this Agreement shall become void and of no effect with no liability on the part of either Party hereto.

*[Signature Page Follows]*

~~IN WITNESS WHEREOF,~~ the Parties have executed this Merger Agreement as of the date first
above written.

OCWEN LOAN SERVICING, LLC,
a Delaware limited liability company

By: _____
Name:    Arthur C. Walker, Jr.
Title:    Senior Vice President

Signed in: _St. Croix, USVI_

PHH MORTGAGE CORPORATION,
a New Jersey corporation

By: _____
Name:    Leah E. Hutton
Title:    Assistant Secretary

Signed in: _St. Croix, USVI_

*Execution Version*

## AMENDMENT AGREEMENT TO "AGREEMENT AND PLAN OF MERGER"

THIS AMENDMENT AGREEMENT (the "*Amendment Agreement*") is entered into as of May 29, 2019 by and between Ocwen Loan Servicing, LLC, a Delaware limited liability company ("*OLS*"), and PHH Mortgage Corporation, a New Jersey corporation ("*PMC*"). OLS and PMC are collectively referred to herein as the "*Parties*" and each, individually, as a "*Party*."

## WITNESSETH:

WHEREAS, OLS and PMC have previously entered into an Agreement and Plan of Merger dated May 2, 2019 to be effective the later of (A) 12:01 a.m. Eastern Time on June 1, 2019, or (B) upon the filing of the applicable Certificate of Merger with the Secretary of State of the State of Delaware and the applicable Certificate of Merger with the New Jersey Division of Revenue;

WHEREAS, the Parties have both adopted the OMS-PMC Plan of Reorganization and intend for this Merger to occur pursuant to the overall Transactions laid out in the OMS-PMC Plan of Reorganization, that, when taken together, are intended to be and will be treated as a tax-free reorganization under section 368(a)(1) of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder; and

WHEREAS, OLS and PMC have each determined that it is advisable and in the best interests of said entities that the following the terms and conditions of be included in the Merger Agreement.

NOW, THEREFORE, BE IT RESOLVED, in consideration of the mutual agreements and covenants set forth herein, OLS and PMC hereby agree to add the following terms to section 7 of the May 2, 2019 Agreement and Plan of Merger as follows:

(j) <u>Title Passage</u>. Title to all assets and liabilities transferred in this Agreement, whether directly or indirectly, shall be deemed and treated by both parties to pass in the United States Virgin Islands.

(k) <u>US Tax Treatment and Timing of Deemed Shares</u>. The Agreement does not contemplate any actual transfer of stock between the Parties, but shares may be deemed to be issued for U. S. Federal Income tax purposes. For the avoidance of any doubt, both parties agree and will treat any shares that are deemed to be issued to be distributed and/or contributed (in any additional deemed transactions) as of the Effective Time (as defined herein) to result in the deemed ownership of shares to be consistent with actual ownership as of the Effective Time.

FURTHER RESOLVED, all other terms of the Merger Agreement, including the Effective Time, are hereby expressly affirmed.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have executed this Amendment Agreement as of the date first above written.

OCWEN LOAN SERVICING, LLC,

a Delaware limited liability company

By: _____

Name:    Arthur C. Walker, Jr.

Title:    Senior Vice President

Signed in: _____

PHH MORTGAGE CORPORATION,

a New Jersey corporation

By: _____

Name:    John P. Kim

Title:    Vice President, Capital Markets

Signed in: _____

2